UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x
KRISTAN MARIE TETMEYER,

                Plaintiff,

                                              **MEMORANDUM & ORDER**
v.                                                    16-CV-3074 (PKC)

CAROLYN W. COLVIN,
Acting Commissioner of Social Security,

                Defendant.
-----------------------------------------------------------------x
PAMELA K. CHEN, United States District Judge:

Plaintiff Kristan M. Tetmeyer ("Plaintiff") brings this action under 42 U.S.C. § 405(g), seeking judicial review of the Social Security Administration's ("SSA") denial of her claim for Disability Insurance Benefits ("DIB"). The parties have cross-moved for judgment on the pleadings. (Dkts. 9, 12.) Plaintiff seeks reversal of the Commissioner's decision and an immediate award of benefits, or alternatively, remand for further administrative proceedings. The Commissioner seeks affirmation of the denial of Plaintiff's claims. For the reasons set forth below, the Court grants Plaintiff's motion for judgment on the pleadings and denies the Commissioner's motion. The case is remanded for further proceedings consistent with this Order.

## BACKGROUND

### I. PROCEDURAL HISTORY

On May 12, 2014, Plaintiff filed an application for DIB, claiming that she was disabled beginning on January 29, 2009. (Tr. 184-85, 208, 212.)[1] After her claim was denied (Tr. 110, 111-13), Plaintiff requested and appeared at a hearing before an administrative law judge ("ALJ") on December 15, 2015 (Tr. 52-84, 119). The ALJ issued a decision on January 20, 2016, finding

---

[1] All references to "Tr." refer to the consecutively paginated Administrative Transcript.

that Plaintiff was not disabled from January 29, 2009, her alleged onset date, through June 30, 2014, the date Plaintiff last met the insured status requirements of Title II of the Social Security Act. (Tr. 30-44.) The ALJ's decision became the final decision of the Commissioner when the Appeals Council denied Plaintiff's request for review. (Tr. 1-5.)

## II. STANDARD OF REVIEW

Unsuccessful claimants for disability benefits under the Social Security Act (the "Act") may bring an action in federal district court seeking judicial review of the Commissioner's denial of their benefits. 42 U.S.C. § 405(g). In reviewing a final decision of the Commissioner, the Court's role is "limited to determining whether the SSA's conclusions were supported by substantial evidence in the record and were based on a correct legal standard." *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012) (quotation omitted). "Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) (alterations and internal quotation marks omitted) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). In determining whether the Commissioner's findings were based upon substantial evidence, "the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn." *Id.* (quotation omitted). However, "it is up to the agency, and not this court, to weigh the conflicting evidence in the record." *Clark v. Comm'r of Soc. Sec.*, 143 F.3d 115, 118 (2d Cir. 1998). If there is substantial evidence in the record to support the Commissioner's findings as to any fact, those findings are conclusive and must be upheld. 42 U.S.C. § 405(g); *see also Cichocki v. Astrue*, 729 F.3d 172, 175-76 (2d Cir. 2013).

## III. ELIGIBILITY STANDARD FOR SOCIAL SECURITY DISABILITY BENEFITS

To receive DIB, claimants must be disabled within the meaning of the Act. Claimants establish disability status by demonstrating an inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3). The claimant bears the initial burden of proof on disability status and must demonstrate disability status by presenting medical signs and findings, established by "medically acceptable clinical or laboratory diagnostic techniques," as well as any other evidence the Commissioner may require. 42 U.S.C. §§ 423(d)(5)(A), 1382c(a)(3)(D). However, the ALJ has an affirmative obligation to develop the administrative record. *Lamay v. Comm'r of Soc. Sec.*, 562 F.3d 503, 508-09 (2d Cir. 2009). This means that the ALJ must seek additional evidence or clarification when the claimant's medical reports contain conflicts or ambiguities, if the reports do not contain all necessary information, or if the reports lack medically acceptable clinic and laboratory diagnostic techniques. *Demera v. Astrue*, No. 12 Civ. 432, 2013 WL 391006, at *3 (E.D.N.Y. Jan. 24, 2013); *Mantovani v. Astrue*, No. 09 Civ. 3957, 2011 WL 1304148, at *3 (E.D.N.Y. Mar. 31, 2011).

In evaluating disability claims, the ALJ must adhere to a five-step inquiry. The claimant bears the burden of proof in the first four steps in the inquiry; the Commissioner bears the burden in the final step. *Talavera*, 697 F.3d at 151. First, the ALJ determines whether the claimant is currently engaged in "substantial gainful activity." 20 C.F.R. § 404.1520(a)(4)(i). If the answer is yes, the claimant is not disabled. If the claimant is not engaged in "substantial gainful activity," the ALJ proceeds to the second step to determine whether the claimant suffers from a "severe impairment." 20 C.F.R. § 404.1520(a)(4)(ii). An impairment is determined to be severe when it

3

"significantly limits [the claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c). If the impairment is not severe, then the claimant is not disabled within the meaning of the Act. However, if the impairment is severe, the ALJ proceeds to the third step, which considers whether the impairment meets or equals one of the impairments listed in the Act's regulations (the "Listings"). 20 CFR § 404.1520(a)(4)(iii); *see also* 20 C.F.R. Pt. 404, Subpt. P, App. 1.

If the ALJ determines at step three that the claimant has one of the listed impairments, then the ALJ will find that the claimant is disabled under the Act. On the other hand, if the claimant does not have a listed impairment, the ALJ must determine the claimant's "residual functional capacity" ("RFC") before continuing with steps four and five. The claimant's RFC is an assessment which considers the claimant's "impairment(s), and any related symptoms . . . [which] may cause physical and mental limitations that affect what [the claimant] can do in the work setting." 20 C.F.R. § 404.1545(a)(1). The ALJ will then use the RFC determination in step four to determine if the claimant can perform past relevant work. 20 C.F.R. § 404.1520(a)(4)(iv). If the answer is yes, the claimant is not disabled. Otherwise the ALJ will proceed to step five where the Commissioner then must determine whether the claimant, given the claimant's RFC, age, education, and work experience, has the capacity to perform other substantial gainful work in the national economy. 20 C.F.R. § 404.1520(a)(4)(v). If the answer is yes, the claimant is not disabled; otherwise the claimant is disabled and is entitled to benefits. *Id.*

IV.     **RELEVANT MEDICAL HISTORY**

In her application for DIB, Plaintiff claimed that she was disabled starting no later than January 29, 2009, because of lupus, a back injury, diabetes, and a "connective tissue disorder." (Tr. 212.) The administrative record contains voluminous documentation of Plaintiff's medical

history, which includes a spinal surgery in October 2007, numerous visits to the emergency room, multiple physical and mental examinations, ongoing post-operative treatment after her spinal surgery, and ongoing treatment for chronic pain. (*See* Dkt. 9-2 (Pl.'s Br.) at 1-10; Dkt. 13 (Resp.'s Br.) at 2-13.) Due to the narrow grounds on which this Order remands Plaintiff's application for further proceedings, the Court recites only those aspects of Plaintiff's medical history that are relevant to resolving the pending motions.

In July 1997, when she was thirteen, Plaintiff was referred to Dr. Norman Ilowite, a Rheumatologist, for an evaluation of her symptoms of fatigue, adenopathy, and a positive ANA.[2] (Tr. 311.) Dr. Ilowite reported that Plaintiff's symptoms of fatigue and increased sleeping had begun in January 1996, nearly two years before Plaintiff was referred to Dr. Ilowite, when Plaintiff was eleven years old. (Tr. 311.) Based on a single examination of Plaintiff and a review of laboratory records, Dr. Ilowite stated his impression that Plaintiff's positive ANA test, which is one diagnostic indicator of Systemic Lupus Erythematosus ("SLE"), was likely a "false-positive ANA secondary to infectious mononucleosis," and "that it was unlikely that [Plaintiff] suffers a chronic rheumatic disease such as [SLE] . . . ." (Tr. 311-12.)

In September 2001, when she was seventeen, Plaintiff was referred to Dr. Lynn A. Hawkins, a Pediatric Endocrinologist, for an evaluation of her symptoms of chronic fatigue and abnormal thyroid function. (Tr. 306-09.) Plaintiff was accompanied by her mother, who told Dr. Hawkins that Plaintiff's tiredness and fatigue had begun as early as 1996, when Plaintiff was

---

[2] A "positive ANA" refers to the presence of antibodies showing an affinity for nuclear antigens including DNA. *Antinuclear antibody (ANA)*, Stedman's Medical Dictionary 47140. A positive ANA is one indicator of Systemic Lupus Erythematosus (SLE), commonly referred to as lupus, which is "an inflammatory connective tissue disease with variable features, frequently including fever, weakness and fatigability, joint pains or arthritis resembling rheumatoid arthritis . . . ." *Systemic lupus erythematosus (SLE)*, Stedman's Medical Dictionary 515390; *see also* 20 C.F.R. Pt. 404, Subpt. P, App. 1, 114.02 ("Systemic lupus erythematosus").

eleven or twelve. (Tr. 306.) Dr. Hawkins noted that, at the time of the visit, Plaintiff slept approximately 10 hours per night, plus an additional two to three hours each day after school. (Tr. 307.) Based on an examination of Plaintiff and a review of laboratory records, Dr. Hawkins opined that Plaintiff's chronic fatigue was not related to hypothyroidism. (Tr. 308.)

In October 2003, when she was nineteen, Plaintiff again visited Dr. Ilowite. (Tr. 310.) Dr. Ilowite noted that Plaintiff had once again shown a positive ANA, but concluded that "the ANA was probably a false positive or attributable to thyroiditis and it was unlikely that [Plaintiff] had SLE." (Tr. 310.) Dr. Ilowite also opined that Plaintiff's symptoms might be explained by hypothyroidism. (Tr. 310.)

The record is largely silent on Plaintiff's symptoms and medical treatment between October 2003 and the alleged onset date, January 29, 2009.[3] As a result, the record does not indicate, for example, whether Plaintiff was definitively diagnosed for hypothyroidism or SLE—or any other medical condition that could explain the chronic fatigue that had persisted since she was eleven or twelve years old—after Dr. Ilowite and Dr. Hawkins gave their indeterminate opinions in 1997, 2001, and 2003. (Tr. 306-12.) The post-2009 record does indicate, however, that Plaintiff now has a medical history of SLE (*e.g.*, Tr. 406, 543, 641), that Plaintiff was hospitalized in March, July, and August 2009 for "lupus flare ups" (Tr. 403-04), that Plaintiff's treating physician, Dr. Kathleen Sheu, opined that Plaintiff's symptoms in January and February 2013 "may be pointing to a possible re-activation of her SLE" (Tr. 549, 533), and that Plaintiff registered another positive ANA test in December 2015 (Tr. 672). The record also documents

---

[3] This gap is presumably a result of the limited timeframe of the Commission's medical-records subpoenas, *i.e.*, from January 27, 2009 through December 7, 2015. (Tr. 169-179.)

Plaintiff's complaints of lupus "flare ups" at various times between the alleged onset date and the date last insured. (*E.g.*, Tr. 403, 811.)[4]

Finally, the record contains a medical opinion, dated January 6, 2016, prepared by Avram Goldberg, M.D., a doctor in the Rheumatology Department of NYU Langone Long Island. (Tr. 718-26.) In that opinion, Dr. Goldberg indicated that Plaintiff presented with photosensitivity, a positive test result for ANA in her medical history, severe fatigue, arthralgia,[5] rash, and Reynaud's phenomenon.[6] (Tr. 722-23.) Based on those indicators, Dr. Goldberg opined that Plaintiff "fulfill[s] the current diagnostic criteria for systemic lupus erythematosus (SLE) identified by the American College of Rheumatology." (Tr. 722.)[7] Dr. Goldberg also opined that Plaintiff can perform work in a seated position for only one hour per day, perform work in a standing and/or walking position for only one hour per day, and would likely be absent from work more than three times a month. (Tr. 724-25.)[8]

---

[4] In addition, Plaintiff testified in the hearing that she had been prescribed a steroid treatment for lupus at some point, but that she discontinued that treatment because she "had a horrible reaction to [it]." (Tr. 75.)

[5] Arthralgia is defined as "pain in a joint." *Arthralgia*, Stedman's Medical Dictionary 75390.

[6] Reynaud's phenomenon is a "rare disorder of the blood vessels, usually in the fingers and toes. It causes the blood vessels to narrow when you are cold or feeling stressed. When this happens, blood can't get to the surface of the skin and the affected areas turn white and blue." National Institute of Health, Reynaud's Disease, https://medlineplus.gov/raynaudsdisease.html (last visited September 28, 2017).

[7] The Listings expressly recognize the American College of Rheumatology's methodology for diagnosing SLE. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, 114.02 ("Generally, . . . the medical evidence will show that your SLE satisfies the criteria in the current 'Criteria of the Classification of Systemic Lupus Erythematosus' by the American College of Rheumatology . . . .").

[8] Dr. Goldberg's opinion also noted that additional laboratory testing was "pending" at the time the opinion was rendered. (Tr. 722.)

## V. THE ALJ'S DECISION

### A. Summary of the Decision

The ALJ's decision followed the five-step evaluation process established by the SSA to determine whether an individual is disabled. (Tr. 30-45.) At step one, the ALJ found that Plaintiff did not engage in substantial gainful activity between her alleged onset date (January 29, 2009) through her date last insured (June 30, 2014). (Tr. 32.) At step two, the ALJ determined that Plaintiff had the severe impairments of cervical and lumbar impairments, status-post hemi-laminectomy, Reynaud's disease, and attention deficit hyperactivity disorder (Tr. 32-35); however, the ALJ also found that "the medical evidence does not show any significant symptoms, signs or limitations attributable to [Plaintiff's] reported history of Lupus, status-post cholecystectomy, asthma, vitamin D deficiency and pyelonephritis," and that Plaintiff's allegations of headaches, hand pain, and fibromyalgia did not constitute medically determinable impairments (Tr. 33, 34-35).

At step three, the ALJ determined that Plaintiff's impairments, either singly or in combination, did not meet or medically equal any of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 35-36.) The ALJ therefore proceeded to determine Plaintiff's RFC, finding that Plaintiff was able to perform light work with certain exceptions. (Tr. 37.) Specifically, the ALJ found:

> [T]hrough the date last insured, the claimant had the residual functional capacity to perform light work as defined in 20 C.F.R. 404.1567(b), except the claimant can lift/carry ten pound[s] frequently and twenty pounds occasionally, sit approximately six hours in an eight-hour day and stand/walk approximately six hours in an eight-hour day, with normal breaks, and can occasionally climb ladders[,] ropes or scaffolds, occasionally climb ramps or stairs, occasionally balance, stoop, kneel, crouch and crawl; and should avoid concentrated exposure to extreme cold and irritants, such as dust, fumes, odors, gases and poorly ventilated areas. The claimant would be limited to unskilled work involving no

more than simple, one or two step instructions, as well as low stress tasks involving only occasional decision making and occasional changes in the work setting.

(Tr. 37.)

At step four, the ALJ determined that Plaintiff was unable to perform her past relevant work. (Tr. 42.) At step five, based on Plaintiff's RFC and testimony by a vocational expert, the ALJ determined that Plaintiff could make a successful adjustment to work existing in significant numbers in the national economy. (Tr. 43.) On that basis, the ALJ found that Plaintiff was not disabled from the alleged onset date (January 29, 2009) through the date last insured (June 30, 2014). (Tr. 44.)

### B. Rejection of Plaintiff's Allegation that She Suffers from Lupus

As noted above, in step two of his analysis, the ALJ found, *inter alia*, that "the medical evidence does not show any significant symptoms, signs or limitations attributable to reported history of Lupus . . . ." (Tr. 33.) The ALJ based this finding primarily on Dr. Ilowite's opinions in 1997 and 2003 that did not give a definitive diagnosis for Plaintiff's long-term fatigue, but concluded that Plaintiff likely does not suffer from SLE. *See supra* (summarizing Dr. Ilowite's reports). The ALJ then determined that Plaintiff's records "show no other significant objective evidence of Lupus other than by history, and according to claimant's testimony, she is not receiving treatment/medication for lupus." (Tr. 33; *see also id.* ("[T]he undersigned cannot find that claimant's reported history of lupus . . . ha[s] more than a minimal effect upon the claimant's ability to work.").)

In reaching this conclusion, the ALJ also considered Dr. Goldberg's January 2016 opinion that Plaintiff "fulfill[s] the current diagnostic criteria for systemic lupus erythematosus (SLE) identified by the American College of Rheumatology." (Tr. 33 (citing Tr. 718-26)); *see also supra* (summarizing Dr. Goldberg's opinion). However, the ALJ "accord[ed] little weight to [Dr.

9

Goldberg's] opinion," finding that "it is not supported by objective medical evidence, and [is] largely conclusory in nature and not adequately supported by clinical findings or diagnostic testing." (Tr. 33.)

## DISCUSSION

The Court finds that the ALJ's determination at step two of his evaluation, that "the medical evidence does not show any significant symptoms, signs or limitations attributable to reported history of Lupus" (Tr. 33), is legally erroneous and warrants remand of this matter.

First, the ALJ improperly discounted Dr. Goldberg's medical opinion that Plaintiff "fulfill[s] the current diagnostic criteria for systemic lupus erythematosus (SLE) identified by the American College of Rheumatology," and Dr. Goldberg's opinion as to the limitations that result from that condition. (Tr. 33 (citing Tr. 718-26).) Despite concluding that Dr. Goldberg's opinion was "not supported by objective medical evidence" and "not adequately supported by clinical findings or diagnostic testing" (Tr. 33), the ALJ did not even attempt to explain what "objective medical evidence," "clinical findings," or "diagnostic testing" would be needed to diagnose a person with SLE. (Tr. 33.) Nor did the ALJ retain an expert qualified to identify the medical evidence, clinical findings, or diagnostic testing that is required to diagnose a person with SLE, or obtain expert testimony responding to or rebutting Dr. Goldberg's medical opinion. (Tr. 33.) What is more, the ALJ appears to have discounted Dr. Goldberg's diagnosis in part because certain laboratory testing was "pending" at the time of his opinion, but without identifying any medical authority for the conclusion that Dr. Goldberg could not render a SLE diagnosis without those pending tests, and without acknowledging that Dr. Goldberg's opinion was based on specific diagnostic indicators of SLE, namely, photosensitivity, a positive test result for ANA in her medical history, severe fatigue, arthralgia, rash, and Reynaud's Phenomenon—none of which

10

depended on the additional laboratory tests that were "pending." (*Compare* Tr. 33, *with* Tr. 722-23.)⁹ Put simply, rather than afford significant weight to Dr. Goldberg's diagnosis or, alternatively, retain a qualified expert to offer a competing opinion or to rebut Dr. Goldberg's diagnosis, the ALJ appears to have "set his own expertise against that of [Dr. Goldberg]." *Balsamo v. Chater*, 142 F.3d 75, 81 (2d Cir. 1998) (quotation omitted). This he cannot do. *Id.*; *see also Greek v. Colvin*, 802 F.3d 370, 375 (2d Cir. 2015) ("The ALJ is not permitted to substitute his own expertise or view of the medical proof for the treating physician's opinion or for any competent medical opinion.").¹⁰

Second, the ALJ improperly relied on Dr. Ilowite's indeterminate opinions from 1997 and 2003 in rejecting Plaintiff's assertion that she suffers from SLE. In both of those opinions, Dr. Ilowite noted that Plaintiff had registered a positive ANA test, which is one indicator of SLE, but concluded that the positive ANA was "likely" a false positive. (Tr. 310, 311.) Dr. Ilowite did not, however, render a definitive diagnosis that could explain Plaintiff's chronic fatigue, which reportedly began when she was *eleven* years old. (Tr. 310, 311.) Moreover, the ALJ should have

---

⁹ Furthermore, to the extent the ALJ believed that Dr. Goldberg's diagnosis depended on the results of the pending lab tests, the ALJ should have at least requested a supplemental report from Dr. Goldberg following his receipt of those lab reports, which could have "assist[ed] the ALJ in determining the proper weight to give [Dr. Goldberg's] opinion." *See Miller v. Astrue*, No. 03 Civ. 2072, 2008 WL 2540750, at *10 (S.D.N.Y. June 23, 2008).

¹⁰ To the extent the ALJ discounted Dr. Goldberg's opinion solely because it was rendered after the date last insured, that too was error: "With slowly progressive impairments, it is sometimes impossible to obtain medical evidence establishing the precise date an impairment became disabling." SSR 83-20, 1983 WL 31249 (Jan. 1, 1983). In such cases, "the [ALJ] should call on the services of a medical advisor when onset must be inferred," *id.*, something the ALJ did not do here (Tr. 52-84). *See also Martinez v. Barnhart*, 262 F. Supp. 2d 40, 47 (W.D.N.Y. 2003) (holding that ALJ erred by not appointing medical advisor to infer onset date in the absence of contemporaneous medical records); *Yu v. Astrue*, 963 F. Supp. 2d 201, 214 (E.D.N.Y. 2013) ("Rather than rejecting [a] 'retrospective diagnosis' [based on when it was rendered], the ALJ should . . . assess[] the basis for th[e] diagnosis by developing the record." (citing *Rogers v. Astrue*, 895 F. Supp. 2d 541, 550-52 (S.D.N.Y. 2012) (collecting cases))).

11

assessed the reliability of Dr. Ilowite's provisional diagnosis of thyroid malfunction (Tr. 310) in light of the opinion of Dr. Walken, a Pediatric Endocrinologist, who had already considered and rejected thyroid malfunction as a cause of Plaintiff's fatigue (Tr. 306-09). The ALJ also should have considered Dr. Ilowite's opinions in light of Plaintiff's medical history since October 2003, which suggests that Plaintiff does, in fact, suffer from SLE. *See supra* (citing Tr. 101, 403-04, 533, 549, 672, 811). Viewing Dr. Ilowite's indeterminate opinions in light of the full record before him, the ALJ did not have sufficient evidence on which to determine that Plaintiff does not suffer from SLE. At most, the ALJ had sufficient evidence to determine that Plaintiff's record was incomplete—particularly with respect to the period between October 2003 and January 27, 2009— as to any definitive diagnosis that would explain Plaintiff's chronic fatigue, which she has complained of since she was eleven. Therefore, at a minimum, the ALJ should have made an effort to supplement the record as to Plaintiff's post-2003 treatment and diagnoses confirming or rejecting SLE as the cause of Plaintiff's chronic fatigue. *See Ahisar v. Comm'r of Soc. Sec.*, No. 14 Civ. 4134, 2015 WL 5719710, at *12 (E.D.N.Y. Sept. 29, 2015) ("Consistent with the ALJ's duty to develop the administrative record, an ALJ 'cannot reject a treating physician's diagnosis without first attempting to fill any clear gaps in the administrative record.'" (quoting *Rosa v. Callahan*, 168 F.3d 72, 79 (2d Cir. 1999))); *see also Schaal v. Apfel*, 134 F.3d 496, 505 (2d Cir. 1998) ("[E]ven if the clinical findings were inadequate, it was the ALJ's duty to seek additional information from [the treating physician] *sua sponte*.").

Finally, the Court finds that these errors are grounds for reversal. The ALJ's determination that Plaintiff does not suffer from SLE was a threshold determination that narrowed the range of medical impairments that were considered in assessing Plaintiff's RFC. (Tr. 37-42; *see also* Tr. 33 ("[T]he undersigned cannot find that claimant's reported history of lupus . . . ha[s] more than a

minimal effect upon the claimant's ability to work.").) Indeed, Dr. Goldberg's opinion as to the limitations Plaintiff suffers as a result of SLE directly contradict the ALJ's determination that Plaintiff "can lift/carry ten pound[s] frequently and twenty pounds occasionally, sit approximately six hours in an eight-hour day and stand/walk approximately six hours in an eight-hour day, with normal breaks." (*Compare* Tr. 37, *with* Tr. 723-26.) The other record evidence indicating both that Plaintiff suffers from SLE and from limitations as a result of SLE, *see supra* (citing Tr. 403-04, 406, 533, 543, 549, 641, 811), further bolsters the conclusion that remand is appropriate. *See Vasquez v. Barnhart*, No. 02 Civ. 6751, 2004 WL 725322, at *6-8 (E.D.N.Y. Mar. 2, 2004) (remanding for further proceedings where ALJ determined that Plaintiff was not disabled due to SLE "[without] so much as mention[ing] the obviously highly relevant criteria relating to [an SLE diagnosis]" and "fail[ed] to make findings regarding listing-level impairment [based on SLE]").

Before closing, the Court is obliged to comment on one additional aspect of the ALJ's assessment of Plaintiff's medical limitations. In several places in his analysis, the ALJ found that Plaintiff's activities of daily living were not consistent with her testimony as to the nature and extent of her limitations. (Tr. 33-44.)[11] For example, the ALJ discounted Plaintiff's testimony and the opinions of her doctors based on Plaintiff's supposed statements that she is able, among other things, to "go out alone and shop in stores," handle "cooking, cleaning and light household chores," and "take care of her 7 month old and 8-year old children." (Tr. 33, 35, 36.) And, in four separate places, the ALJ emphasized that Plaintiff can "[make] scrap books, write poetry and take trips to Montauk." (Tr. 33, 36, 38.) The ALJ's emphasis on these daily activities is troubling for two reasons. First, none of these activities appears to be inconsistent with the notion that Plaintiff

---

[11] The ALJ pointed to Plaintiff's "activities of daily living" as a basis on which to discount the opinion of Dr. Goldberg (Tr. 33), the opinion of Dr. Lattuga (Tr. 39), and Plaintiff's own allegations of disability (Tr. 38).

13

is unable to stand or sit for more than one hour at a time, let alone support the ALJ's determination that Plaintiff is able to "sit approximately six hours in an eight-hour day and stand/walk approximately six hours in an eight-hour day, with normal breaks." (Tr. 37.) Thus, Plaintiff's ability to engage in these activities does not appear to rebut Plaintiff's claim of total disability in the manner the ALJ found. *See, e.g.*, *Brown v. Comm'r of Soc. Sec.*, No. 06 Civ. 3174, 2011 WL 1004696, at *5 (E.D.N.Y. Mar. 18, 2011) ("It is well-settled law in this Circuit that [the performance of basic daily activities] does not, in itself, contradict a claim of disability, 'as people should not be penalized for enduring the pain of their disability in order to care for themselves.'" (quoting *Woodford v. Apfel*, 93 F.Supp.2d 521, 529 (S.D.N.Y. 2000))). Second, and more concerning, the ALJ's characterizations of Plaintiff's daily activities are not entirely accurate, and, in some places, are outright misleading. The most egregious example of such mischaracterization is the ALJ's repeated emphasis that Plaintiff can "[make] scrap books, write poetry and take trips to Montauk." (Tr. 33, 36, 38.) To support that proposition, the ALJ cites to Plaintiff's Function Report, in which she indeed stated that her "hobbies and interests" include "reading, scrap booking, local travel to Montauk, poetry writing, [and] sports." (Tr. 237.) In suggesting that Plaintiff's participation in these activities undermines Plaintiff's claim of disability, the ALJ ignored—and omitted from his decision—the qualifying statements that begin on the very next line of the Function Report:

> [Q:] How often do you do these things?
> [A:] [A]lmost never, very rare
> [Q:] Describe any changes in these activities since your illnesses, injuries, or conditions began
> [A:] Inability to sit for length of time, no feeling in arms/hands & feet, Lupus flares make me have extreme fatigue, sports I can't play because of pain.

(Tr. 237.) By omitting these and other of Plaintiff's qualifying statements from his decision, the ALJ painted a picture of Plaintiff's activities of daily living that, quite simply, is not consistent

with the record. On remand, the ALJ is reminded to give due and *accurate* consideration to Plaintiff's statements regarding her activities of daily living and to properly consider them in the context of the complete medical record.

## CONCLUSION

For the reasons set forth above, the Court grants Plaintiff's motion for judgment on the pleadings and denies the Commissioner's cross-motion. The Commissioner's decision is remanded for further consideration consistent with this Order. The Clerk of Court is respectfully requested to enter judgment and close this case.

SO ORDERED.

*/s/ Pamela K. Chen*

Pamela K. Chen
United States District Judge

Dated: Brooklyn, New York
      September 28, 2017